DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

S. WAQAR HASIB (CABN 234818)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      FAX: (415) 436-7234
      waqar.hasib@usdoj.gov

ANNALOU TIROL (CABN 216578)
Acting Chief, Public Integrity Section

AMANDA R. VAUGHN (MD Bar)
Trial Attorney

      1400 New York Ave. NW
      Washington, D.C. 20005
      Telephone: (202) 514-1412
      Fax: (202) 514-3003
      amanda.vaughn@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JAMES TONG,<br><br>    Defendant. | CASE NO. 17-CR-474-JST<br><br>**UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS (Def.'s Mot., ECF No. 59, Part A; Def.'s Mot., ECF No. 61; Def.'s Mot., ECF No. 62)** |

## TABLE OF CONTENTS

I.      FACTUAL AND PROCEDURAL BACKGROUND ...................................................1

        A.      The Investigation and Resulting Indictment Charging the Defendant with
                Knowingly and Willfully Making Unlawful Conduit Contributions. ...........1

        B.      The Defendant's Prior Criminal History. ...................................................4

II.     THERE IS NO BASIS FOR DISMISSING THE INDICTMENT BASED ON
        THE DEFENDANT'S PRIOR PLEA AGREEMENT IN AN UNRELATED
        CASE. ....................................................................................................................5

        A.      The Government Has Not Violated the Defendant's Plea Agreement in
                His Environmental Crimes Case and the Defendant is Not Entitled to an
                Evidentiary Hearing on the Matter. ...........................................................5

        B.      The Defendant Has Not Met His Burden to Obtain Dismissal on
                Vindictive Prosecution Grounds. ................................................................9

        C.      The Defendant Has Not Met His Burden to Obtain Additional Discovery
                on His Vindictive Prosecution Claim. .......................................................14

III.    THE DEFENDANT HAS FAILED TO MAKE A SHOWING OF SELECTIVE
        PROSECUTION AND HE IS NOT ENTITLED TO DISCOVERY ON HIS
        CLAIM. ................................................................................................................16

        A.      The Defendant Has Failed to Present Clear Evidence that the
                Government Sought the Pending Indictment for Impermissible Reasons. ...16

        B.      The Defendant Has Not Met His Burden to Obtain Discovery on His
                Selective Prosecution Claim. ....................................................................21

IV.     THE DEFENDANT HAS FAILED TO MAKE A SHOWING OF SELECTIVE
        ENFORCEMENT AND ADDITIONAL DISCOVERY IS NOT WARRANTED. ........21

        A.      The Defendant Has Failed to Present Evidence that the Pending
                Indictment is the Result of Selective Enforcement. ...................................21

        B.      The Defendant is Not Entitled to Discovery on His Selective Enforcement
                Claim. .....................................................................................................23

V.      THE STATUTE BARRING CONTRIBUTIONS IN THE NAMES OF OTHERS
        IS NOT UNCONSTITUTIONALLY VAGUE. ........................................................24

VI.     CONCLUSION ...................................................................................................26

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978).................................................................................................. 16

*Rosenbaum v. City and County of San Francisco*,
    484 F.3d 1142 (9th Cir. 2007) ............................................................................... 22

*United States v. Adam Victor*,
    No. 17-CR-53 (D.D.C.).......................................................................................... 19

*United States v. Armstrong*,
    517 U.S. 456 (1996);................................................................................... 16, 17, 21

*United States v. Banks*,
    514 F.3d 959 (9th Cir. 2008) ................................................................................. 25

*United States v. Bass*,
    536 U.S. 862 (2002)............................................................................................... 21

*United States v. Batchelder*,
    442 U.S. 114 (1979)......................................................................................... 24, 25

*United States v. De La Fuente*,
    8 F.3d 1333 (9th Cir. 1993) ............................................................................ 6, 7, 8

*United States v. DeMarco*,
    550 F.2d 1224 (9th Cir. 1977) ............................................................................... 10

*United States v. Edmonson*,
    792 F.2d 1492 (9th Cir. 1986) ............................................................................... 25

*United States v. Fieger*,
    No. 07-CR-20414, 2008 WL 205244 (E.D. Mich. Jan. 24, 2008)......................... 15

*United States v. Gallegos-Curiel*,
    681 F.2d 1164 (9th Cir. 1982) ............................................................................... 11

*United States v. Jenkins*,
    504 F.3d 694 (9th Cir. 2007) ................................................................................. 10

*United States v. Johnson*,
    No. 11-CR-501 (D. Utah) ................................................................................ 18, 25

*United States v. Kenneth Smukler*,
    No. 17-CR-563 (E.D. Pa).................................................................................... 19

*United States v. Kuburovich*,
    No. 16-CR-373-EJD, 2018 WL 835049 (N.D. Cal. Feb. 13, 2018) ....................... 14

*United States v. Michael Liberty*,
    No. 16-CR-144, (D. Maine).................................................................................... 19

*United States v. Mumphrey*,
    193 F. Supp. 3d 1040 (N.D. Cal. 2016) ...................................................... 17, 23, 24

*United States v. One 1985 Mercedes*,
    917 F.2d 415 (9th Cir. 1990) ................................................................................. 14

*United States v. Pressley*,
    865 F. Supp. 2d 606 (D.N.J. 2012) ......................................................................... 8

*United States v. Robison*,
    644 F.2d 1270 (9th Cir. 1981) ............................................................................... 12

*United States v. Rosenthal*,
    No. 02-CR-0053-CRB, 2007 WL 801647 (N.D. Cal. Mar. 14, 2007) ............... 10, 12

*United States v. Sutton*,
    794 F.2d 1415 (9th Cir. 1986) ................................................................................. 7, 8
*United States v. Turner*,
    104 F.3d 1180 (9th Cir. 1997) ...................................................................................... 19
*Wayte v. United States*,
    470 U.S. 598 (1985) ............................................................................................ 16, 19, 22


**Statutes**

52 U.S.C. § 30122 ........................................................................................................... 1, 4
52 U.S.C. § 30109 .................................................................................................. 1, 24, 25

On August 31, 2017, a grand jury in the Northern District of California returned a two-count Indictment against the defendant, James Tong, charging him with knowingly and willfully making contributions in the names of others to a candidate for federal office aggregating more than $10,000 in a calendar year—all in violation of Sections 30122 & 30109(d)(1)(D) of the Federal Election Campaign Act (FECA).   The defendant now moves to dismiss the Indictment on meritless claims that the Government violated his plea agreement in his other case, that he's the victim of vindictive prosecution, selective prosecution, and selective enforcement, and that the statute under which he is charged is unconstitutionally vague.  Def.'s Mots., ECF Nos. 59, 61, 62.  In the alternative, the defendant makes unwarranted demands for discovery on his plea violation, vindictive prosecution, selective prosecution, and selective enforcement claims (the latter of which the Court has denied once already).  Def.'s Mots., ECF No. 61, at 18-19, ECF No. 62, at 14, 16-18, 23-24.  The defendant has failed to establish any basis to dismiss the Indictment against him and has not provided any basis for reversing this Court's prior Order regarding discovery, issuing new discovery Orders, or further delaying progress to trial in this matter to allow the defendant to rummage through the Government's files on frivolous claims of Government wrongdoing.  All of the defendant's motions to dismiss and for additional discovery should be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Investigation and Resulting Indictment Charging the Defendant with Knowingly and Willfully Making Unlawful Conduit Contributions.

In early 2014, the Federal Bureau of Investigation (FBI) opened an investigation unrelated to the allegations at issue in this case that was focused on individuals other than the defendant.  Ex. A, Medearis Decl. ¶ 2.  In the course of that investigation, in May 2015, FBI agents interviewed several employees of a local bank about contributions they had made to the individual identified as Candidate 1 in the Indictment.  *Id*. ¶ 8; *id*. Attach. 2.  Unexpectedly, the employees stated they had made the contributions at the defendant's request and several admitted they had been reimbursed for those contributions.  *Id*.

In April 2016, having received this evidence, the FBI opened an investigation into the defendant's making of conduit contributions.  *Id*. ¶ 10; *id*. Attach. 3.  Before opening the matter, the FBI consulted with the undersigned attorney of the Public Integrity Section of the U.S. Department of Justice.  *Id*. Attach.

1    3 at 4.  Over the following sixteen months, FBI agents interviewed well over 50 donors to Candidate 1's

2    campaign who agents determined had written contribution checks at the request of the defendant, were

3    associated with other individuals the defendant had used as straw donors, or had made contributions at

4    times and in amounts similar to confirmed or suspected straw donors.  *Id.* ¶ 11.  These individuals'

5    financial records also were obtained.  *Id.*

6         The investigation ultimately revealed that the defendant used networks of individuals at businesses

7    he either frequented or had dealings with to make thousands of dollars in conduit contributions to

8    Candidate 1 in 2012 and 2013.  *See, e.g.*, Ex. C at 5:12-7:24, 30:19-32:24, 55:1-23 (bank manager

9    describing receiving cash from the defendant on two occasions to recruit and reimburse donors); Ex. D at

10   7:12-10:25 (restaurant employee describing the defendant's request that she and others contribute to a

11   Candidate 1 and his reimbursement of her); *see generally* Gruel Decl. Ex. A, ECF No. 60-1 (FBI Special

12   Agent Scott Medearis testimony reviewing the defendant's use of the same individuals to find conduit

13   contributors in 2012 and 2013).  He tapped the same networks in both years, *see, e.g.*, *id.* and the

14   defendant's use of conduits extended by thousands of dollars beyond just those presented to the grand

15   jury,[1] Ex. E at 16:15-18:23 (additional business associate describing receiving cash from the defendant to

16   recruit and reimburse donors).  The defendant positioned himself as an indispensable fundraiser to

17   Candidate 1's campaign—in part due to the contributions he made by using straw donors—and, as a result,

18   he obtained a high level to the candidate.  Ex. F at 2, 5 (statement of Candidate 1 staff member).

19        Not only did the evidence gathered during the investigation demonstrate a pattern of

20   reimbursements to straw donors by the defendant in 2012 and 2013, it also revealed that the defendant

21

22   _____

23   [1] In his motion to dismiss on vagueness grounds, the defendant suggests that the Government's evidence at trial would be limited to that presented by SA Medearis to the grand jury.  Def.'s Mot., ECF No. 59, at 9-10 (referring to SA Medearis's grand jury presentation and claiming that the Government's evidence in this case is "on the very low end of the felony spectrum").  The Government's presentation at trial is not limited in this way, and, in fact, SA Medearis explicitly testified that he was not presenting the totality of the Government's investigation.  Ex. G at 27:5-8 (referencing Grand Jury Exhibit 1).  Moreover, the Government has provided the defendant with discovery and stated in its opposition to the defendant's discovery motions that its evidence of his scheme exceeds that presented to the grand jury.  *See* Gov't Opp. to Def.'s Mots., ECF No. 42, at 18 (noting that, "once additional conduit activity by the defendant came to light after indictment, the government provided the defendant with additional 302s related to that part of his scheme, to which were attached additional lists of conduits the defendant used").

28

knew making conduit contributions was unlawful.  The defendant was aware of limits and FEC oversight associated with making contributions.  Ex. H at 44:6-24 (bank manager describing the defendant's statements regarding FEC markings); Ex. I at 51:1-14 (bank manager describing the defendant's statement regarding contributions limits).  Moreover, in February 2017, the Government approached the defendant for a voluntary interview, which he provided.[2]  Ex. J (report of interview).  While the defendant denied that he had made conduit contributions to any political candidates, he did affirm that he knew what conduit contributions were and that they were unlawful.  *Id*.  In fact, he had likely known for many years, because he had been cited at the state level before for making conduit contributions.  Ex. K at US-000510 (stipulation between the defendant and the California Fair Political Practices Commission).

Further, it was later revealed that the defendant took steps to conceal his scheme, telling some donors unfamiliar with Candidate 1 that the contributions were for charity, Ex. D at 9:4-8, 10:23-25, and instructing at least one straw donor not to deposit the cash the defendant provided so it could not be traced and not to admit to the reimbursement.  Ex. L at 11:7-12:15.  Indeed, upon first being approached by the FBI, many of the straw donors recruited for the defendant's use by one of the defendant's business associates denied having been reimbursed.  *See, e.g.*, Exs. M, N (witness statements).  It was only later, after the return of the Indictment, that the same business associate admitted that, after first being approached by the FBI, he had consulted with the defendant and then spread the defendant's admonition to others not to admit anything to the authorities.  Ex. E at 16:15-17:11 (citing a list of straw donors that included, among others, the individuals whose witness statements are attached as Exhibits M and N as reimbursed donors); Ex. O at 19:1-22:18 (describing a conversation with the defendant after being approached by the FBI not to admit anything and sharing that message with others).

The defendant now faces an Indictment for a straightforward conduit contribution scheme:  In 2012 and 2013, the defendant had other individuals write contribution checks to Candidate 1's campaign committee, which he secretly funded by providing cash reimbursements.  Providing the money for individuals to make contributions to federal candidates for office—in other words, making contributions

---

[2] At the time, the Government had no information and no reason to believe that the defendant was represented in this matter.

1   in the names of others—is barred by federal law.  *See* 52 U.S.C. § 30122.  By making contributions in this

2   manner, not only did the defendant make contributions exceeding lawful limits, but he prevented public

3   transparency of who financially supported Candidate 1's campaign by causing the campaign to report

4   contributions from individuals that had, in fact, been made by the defendant.  In seeking the Indictment

5   and prosecuting this case, the Government has properly and diligently carried out its duties to enforce the

6   law.

7   **B.     The Defendant's Prior Criminal History.**

8          As discussed above, the investigation leading to the instant Indictment was opened in April 2016

9   after consultation with the Public Integrity Section of the U.S. Department of Justice.  Three months prior,

10  on January 8, 2016, the defendant pled guilty in a separate case in front of this Court in which he admitted

11  to violating the Endangered Species Act (ESA).  *See United States v. Tong*, No. 15-CR-512-JST, ECF

12  Nos. 6, 7.  The two cases were investigated by separate agencies.  Unlike the case here, the investigation

13  leading to the defendant's ESA guilty plea was led by agents of the U.S. Fish and Wildlife Service

14  (USFWS) and the California Department of Fish and Wildlife (CDFW).  Ex. B, Kozicki Decl. ¶ 2.

15  Moreover, the Public Integrity Section was not involved in the prior environmental crimes case, and,

16  within the United States Attorney's Office for the Northern District of California ("the USAO"), the cases

17  were handled by different prosecutors in different sections.  *Id*.  The two prosecution teams did not work

18  together, and during the course of the investigation leading to the environmental crimes plea, the lead case

19  agent on that case was not aware of any evidence of campaign finance violations, *Id*. ¶ 6.

20         According to letters provided by the defendant with his motions to dismiss between his counsel

21  and AUSA Maureen Bessette—assigned to the environmental crimes case—plea negotiations in his prior

22  case opened in January 2015 at the request of the defendant's counsel, Gruel Decl. Ex. B, ECF No. 61-2,

23  more than a year before the FBI opened the instant investigation and five months before the FBI received

24  any evidence that the defendant may have made conduit contributions to Candidate 1's campaign, Ex. A,

25  Medearis Decl. ¶¶ 8, 10.  It was only in September and October 2016, that the two sets of case agents first

26  had contact and shared details of the environmental crimes investigation, which consisted of: (1) the

27  original Information and terms of the plea agreement the defendant and his company had entered with the

28

USAO, (2) materials provided by USFWS Special Agent John Baker about a search warrant executed at the defendant's business, and (3) statements made by SA Baker and California Fish and Game Warden Nicole Kozicki on October 6, 2016, as memorialized in an FBI-302. Ex. A, Medearis Decl. Attachs. 5-8. These materials ultimately had minimal impact on the instant investigation. *See id*. ¶¶ 15-22. These contacts and shared materials provided no evidence that supported the Indictment returned in this case, and, after the October 6, 2016, meeting, the two teams had no further contact. *Id*. ¶ 19. The prosecution team in the instant case then continued with its investigation. Almost a year later, when it had presented evidence supporting a finding that there was probable cause to believe the defendant had made contributions in the names of others in excess of $10,000 in the calendar years 2012 and 2013, the grand jury returned the pending Indictment.

## II.    THERE IS NO BASIS FOR DISMISSING THE INDICTMENT BASED ON THE DEFENDANT'S PRIOR PLEA AGREEMENT IN AN UNRELATED CASE.

The defendant focuses on his plea agreement in his prior environmental crimes case to argue for dismissal based on two claims: (1) that the pending Indictment was a result of the Government's improper use of evidence obtained in his prior case, Def.'s Mot., ECF No. 61, at 10-18; and (2) that the pending Indictment was sought in retaliation for some exercise of his protected rights in his prior case, Def.'s Mot., ECF No. 62, at 18-23. Neither claim has merit. They are based instead on a post hoc contortion of the terms of his prior plea agreement and an erroneous understanding of how the instant investigation originated and progressed. In the alternative, the defendant seeks an evidentiary hearing on what information the prosecution team in this case obtained from the prior prosecution team and further discovery to support his vindictive prosecution claim. An evidentiary hearing would be useless because sharing information between investigative teams was not barred by his prior plea agreement, and, in the absence of any evidence to support his vindictive prosecution claim, both requests should be rejected.

### A.    The Government Has Not Violated the Defendant's Plea Agreement in His Environmental Crimes Case and the Defendant is Not Entitled to an Evidentiary Hearing on the Matter.

In Paragraph Thirteen of the defendant's plea agreement in his environmental crimes case the USAO agreed—notably, the plea agreement expressly did not bind any other federal, state, or local

1   agency, such as the FBI or the Public Integrity Section, Gruel Decl. Ex. D ¶ 12, ECF No. 61-1—that it

2   would not "file any additional charges against the defendant . . . *that could be filed as a result* of the facts

3   learned during the investigation that led to the captioned Superseding Information," *id.* ¶ 13 (emphasis

4   added).  The plea agreement then provided examples of the types of charges that ostensibly could have

5   been brought by the USAO based on the facts learned in the prior investigation but were not under the

6   plea agreement, including violations of the ESA, false statements, securities fraud, and mail and wire

7   fraud, all in relation to what appear to be properties associated with the defendant.  *Id.*

8        The defendant claims the Government violated this provision by seeking the instant Indictment for

9   campaign finance violations.  As the defendant acknowledges in his motion, however, "[t]he only possible

10  interpretation of this provision is that it precludes the filing of any criminal charges *predicated* on facts

11  learned" in the prior case.  Def.'s Mot., ECF No. 61, at 12 (emphasis added).  The only facts from the

12  prior investigation that the defendant claims to have any relevance to the instant Indictment are the identity

13  of Tong's internet service provider, the names of Tong's employees, that Tong supported Candidate 1,

14  that the Mayflower Restaurant was Tong's favorite restaurant, that emails existed between Tong and

15  Candidate 1 during the relevant time period, and that Tong's secretaries wrote emails for him.  Def.'s

16  Mot., ECF No. 61, at 7-8, 12-13.  The defendant fails to explain how the current charges for making

17  conduit contributions are predicated on any of these facts, or even could be.  Even taken all together, it

18  does not appear these facts constitute a federal crime.  Accordingly, his claim fails.

19       Likely recognizing this lack of overlap, the defendant claims that the prohibition on the USAO to

20  file additional charges as a result of facts learned in the prior investigation actually refers to a prohibition

21  on the sharing of any facts learned between any investigative teams into perpetuity.  Def.'s Mot., ECF No.

22  61, at 12 ("Tong and his counsel accepted the plea agreement with the understanding that the entire body

23  of evidence obtained as a result of the Tong I investigation would be quarantined and inapplicable to any

24  future cases against him, irrespective of the subject matter.").

25       In interpreting a plea agreement, "the court must determine what the defendant reasonably

26  understood to be the terms of the agreement."  *United States v. De La Fuente*, 8 F.3d 1333, 1338 (9th Cir.

27  1993).  It is an objective evaluation of the reasonableness of the defendant's interpretation that controls.

28

*Id.* at 1337 n.7.  That a bar on additional charges equates to a bar on derivative use of any evidence gathered in the corresponding investigation is simply not reasonable.  *Cf. United States v. Sutton*, 794 F.2d 1415, 1423 (9th Cir. 1986) ("The words 'conduct known to the government' cannot fairly be construed as 'conduct that reasonably could have been known.'").  And the defendant points to no facts supporting his claim that his contemporaneous understanding was that the mere sharing of information was barred.

Instead, the plea agreement's plain language and the evidence the defendant does provide of his contemporaneous understanding demonstrates that all the parties reasonably could have understood at the time they entered the agreement was that the USAO would not bring any additional charges it could have brought based on its investigation to that point.  First, language barring the sharing of information appears nowhere in the plea agreement and the defendant's interpretation writes the limitation of the USAO's agreement to the filing of additional charges out of the agreement.  Further, the language "as a result of" in Paragraph 13 of the agreement suggests charges sufficiently established by the facts then known.  Moreover, the meaning of "charges . . . that could be filed as a result of the facts learned" in Paragraph 13 is defined in reference to the list that follows of examples of offenses the government would not seek, all of which are offenses that could have ostensibly been brought on the facts then known.  This understanding is further supported by the letter the defendant attaches from AUSA Maureen Bessette sent in the course of plea negotiations in his other case.  Gruel Decl. Ex. B, ECF No. 61-1.  AUSA Bessette notes that, should the defendant not accept the plea offer he will be charged with some of the offenses ultimately listed as examples the government will no longer pursue under the plea agreement.  *Id*.  Moreover, the plea agreement binds only the USAO.  Gruel Decl. Ex. D ¶ 12, ECF No. 61-1.  It cannot reasonably be read to prevent the sharing of evidence that occurred here without also binding the investigative agencies.

More problematic for the reasonableness of the interpretation the defendant now advances is that under the defendant's reading, he could essentially claim blanket immunity for all time from any charges brought by the USAO.  The agreement binds the entire USAO, not just the prosecutors in his prior case, *id*., meaning any future prosecutors are bound by it even if they are not aware of its terms.  For example, another prosecutor in the office could not bring charges for securities fraud that were based entirely on the same facts admitted in the defendant's plea agreement even if that prosecutor came about those facts

1    some other way.  As the defendant claims, however, the prior investigation revealed facts related to his

2    "email system, his business operations, his staff, and personal habits and connections."  Def.'s Mot., ECF

3    No. 61, at 7.  It is difficult to see how the defendant would not always be able to find some common fact

4    in such broad categories of information between the prior investigation and any subsequent one

5    spearheaded by the USAO such that he could claim some impermissible use of facts learned.  This lack

6    of any limiting principle on the defendant's current reading of the plea agreement demonstrates that it is

7    not what he could have reasonably understood it to mean when he entered it in 2016.

8         In any event, even if sharing of information were barred, the prosecution team cannot be deemed

9    to have *filed* the pending charges on the facts the defendant claims were learned from consultation with

10   the prior prosecution team—which under the defendant's own admission would be necessary to warrant

11   dismissal.  *See* Def.'s Mot. at 21 (claiming he believed, under the agreement, "that the Government would

12   not *bring* any future charges *based on information* gleaned from the investigation in Tong I" (emphasis

13   added)); *id*. at 17-18 (citing *United States v. Pressley*, 865 F. Supp. 2d 606, 616 (D.N.J. 2012) (dismissing

14   a pending indictment without prejudice and allowing the government to re-indict where the government

15   had presented evidence of prior crimes to the grand jury to return the first indictment despite having agreed

16   not to initiate any charges on the basis of those prior crimes).  The defendant has all of the transcripts of

17   evidence presented to the grand jury that returned the pending Indictment but does not point to one piece

18   of evidence supporting probable cause to charge the defendant with conduit contributions that arose from

19   the prior investigation.

20        Even examining the use of information provided by the case agents from the prior case, there is no

21   basis to conclude the Government obtained the pending Indictment from any of it.  At the time the case

22   agents of the two cases met, the ones assigned to this case already knew the defendant's email address and

23   that he supported Candidate 1.  Ex. A, Medearis Decl. ¶¶ 3-4, 8.  Moreover, they had already identified

24   Mayflower Restaurant employees as potential straw donors and learned from one of the witnesses

25   interviewed in May 2015 that the defendant's assistant's name was either Debbie or Dara.  *Id*. ¶¶ 8, 15;

26   *see also id*. Attach. 6 at US-000516 (SA Medearis referencing Debbie Milichichi prior to SA Baker

27   sending any materials); *id*. ¶ 21 (independent witness identifying Dara Eckhardt and providing emails

28

from her about fundraising for Candidate 1). The defendant makes much of the fact that the Government subpoenaed him and Candidate 1's campaign committee after meeting with the case agents in the prior case and learning about email communications between the two individuals, Def.'s Mot., ECF No. 61, at 14, but this is mere coincidence in timing. Violations of FECA must be knowing and willful—information shared between a campaign and a donor and other motive evidence, like the relationship between the donor and the campaign, are highly relevant to determining whether such violations exist. The Government subpoenaed the defendant and Candidate 1's campaign committee for relevant records, including communications, as standard good practice in a conduit contribution investigation. That the agents in the prior case obtained the same records had no bearing on the prosecution team's decision to do so here. Finally, although the Government does not recall obtaining the service provider for the defendant's email address from any other source than Warden Kozicki, Ex. A, Medearis Decl. ¶ 16, the Government did not rely on any information stemming from the identity of the service provider to obtain the pending Indictment. Ex. A., Medearis Decl. ¶¶ 20, 22.

Accordingly, not only has the defendant failed to establish that the Government violated his plea agreement by bringing charges based on different conduct and evidence developed after his plea, but, even if he were correct, he has not established dismissal as the appropriate remedy. Moreover, an evidentiary hearing to trace how the prosecution team used information provided by SA Baker and Warden Kozicki would be a waste of time and the Court should reject the defendant's request to hold one. The relevance of undertaking such an inquiry is based only on the defendant's meritless claim that the plea agreement bars the sharing of information among investigative teams, and, other than making broad claims that the government must still be hiding additional contacts with SA Baker and Warden Kozicki, Def.'s Mot., ECF No. 61, at 19, he points to nothing more that could ostensibly have been based on shared information. The defendant's motion to dismiss the Indictment or for an evidentiary hearing should be denied.

### B. The Defendant Has Not Met His Burden to Obtain Dismissal on Vindictive Prosecution Grounds.

In addition to claiming the Government violated his prior plea agreement by bringing the pending Indictment, he also claims the instant charges are the result of vindictive prosecution. The defendant's

1  claim is meritless.

2        To warrant dismissal for prosecutorial vindictiveness, the burden lies with the defendant to

3  demonstrate that he was penalized "for exercising a protected statutory or constitutional right." *United*

4  *States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007).  He can do this either with "direct evidence of the

5  prosecutor's punitive motivation" or by demonstrating "a *reasonable likelihood* that the government

6  would not have brought the [subsequent] charges" had he not exercised the protected statutory or

7  constitutional right." *Id.* at 700.

8        As an initial matter, the defendant's claim fails because he has not identified what statutory or

9  constitutional right he exercised and for which he is suffering retaliation.  Instead, he broadly asserts he

10  wrested a favorable plea bargain from the USAO in his prior case after he "aggressively asserted a defense

11  to the state charges and the federal investigation arising from" his environmental crimes case.  Def.'s Mot.,

12  ECF No. 62, at 18; *see also id.* at 22 (claiming the Government did not respect his "constitutional rights

13  to defend himself" in his prior case).  This broad claim places him in stark contrast to the defendants who

14  have succeeded on vindictive prosecution claims which the defendant cites here.  *See, e.g.*, *Jenkins*, 504

15  F.3d at 697 (considering a vindictiveness claim where the government filed additional charges after the

16  defendant exercised her right to testify in her own defense at trial on the original charges); *United States*

17  *v. Rosenthal*, No. 02-CR-0053-CRB, 2007 WL 801647, at *1 (N.D. Cal. Mar. 14, 2007) (claiming

18  vindictive prosecution for successfully appealing a conviction).  If the defendant cannot identify with any

19  specificity for what right he is claiming retaliation, he certainly cannot tie any right to the Government's

20  subsequent actions.   The vindictive prosecution doctrine is meant "to prevent chilling the exercise of

21  [legal] rights by other defendants who must make their choices under similar circumstances in the future."

22  *Jenkins*, 504 F.3d at 700 (quoting *United States v. DeMarco*, 550 F.2d 1224, 1227 (9th Cir. 1977)) (internal

23  quotation marks omitted).   That purpose is not served by allowing defendants to claim vindictive

24  prosecution for any subsequent charges regardless of their ability to identify a right exercised in a prior

25  case for which they claim they are being punished.

26        Even to the extent the defendant is deemed to have identified some right he exercised in his prior

27  case, as described above, the progress of this case to indictment was straightforward—the Government

28

1    received evidence of a crime, investigated, and then sought and obtained an indictment based on probable

2    cause to believe a crime had occurred.  The initiation of an investigation into new evidence of criminal

3    conduct—here not even by the same prosecutor or investigating agencies—and the subsequent return of

4    an indictment based on those allegations does not constitute vindictive prosecution.  *United States v.*

5    *Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982) ("When increased charges are filed in the routine

6    course of prosecutorial review or as a result of continuing investigation, there is no realistic likelihood of

7    prosecutorial abuse, and therefore no appearance of vindictive prosecution arises merely because the

8    prosecutor's action was taken after a defense right was exercised." (internal citation omitted)).

9           The defendant claims he has nevertheless demonstrated a reasonable likelihood that the

10   prosecutors would not have brought the pending charges absent some exercise of his rights.  According to

11   the defendant, the Government withheld the existence of an investigation into campaign finance offenses

12   from the defendant in retaliation for him making some unspecified challenge to the potential

13   environmental and real estate fraud charges so that it could obtain a guilty plea, causing the defendant to

14   have a criminal history, and then obtained an indictment for campaign finance offenses for which, if he

15   were convicted, he would then face an increased punishment due to his criminal history.  Def.'s Mot.,

16   ECF No. 62, at 18.

17          The defendant's claim of vindictiveness centers, however, on his misguided conclusion that while

18   negotiating a plea settlement with him in 2015 and January 2016, the prosecution team in his

19   environmental crimes case purposefully withheld from him the existence of the campaign finance

20   investigation and that the prosecutors in the pending case were in on it.  *See* Def.'s Mot., ECF No. 62, at

21   18 (claiming the Government "never revealed that it had Tong in its cross-hairs for another case"); *id*. at

22   22-23 (claiming the Government "could easily have avoided appearing vindictive by talking to him about

23   the election finance investigation at the time the plea agreement in Tong I was being negotiated").  As

24   described in Part I above, this underlying factual premise is wrong.  First, the Government—whether

25   defined as the prosecution team in his environmental case or the prosecution team in the instant case—

26   was not in possession of the evidence supporting the current Indictment during the period of plea

27   negotiations in the prior case.  As discussed above, plea negotiations in the environmental case began in

28

January 2015, more than a year before the investigation was opened in this matter and five months before the FBI, an agency that was not involved in the other case, received any information that the defendant may have made unlawful conduit contributions. Ex. A, Medearis Decl. ¶¶ 8, 10; Gruel Decl. Ex. B., ECF No. 62-1 (January 30, 2015 letter from Gruel making a "settlement offer for global resolution"). Moreover, the prosecution team in the environmental crimes case that was negotiating the plea had no information demonstrating violations of federal campaign finance laws such that it could have withheld this information from the defendant in plea negotiations. Ex. B., Kozicki Decl. ¶ 6.  It was only nine months after entry of the plea that she became aware of the investigation leading to the pending Indictment. *Id*. ¶ 7.  Accordingly, there was no conduit contribution investigation—let alone charges—to resolve unless the defendant had simply offered up admissions of his own wrongdoing.

The defendant's erroneous factual conclusions underlying his argument are based solely on his pasting together one timeline of events from multiple, separate investigations and drawing unwarranted, self-serving inferences from it. Gruel Decl. Ex. A, ECF No. 62-1.  But where, as here, the defendant has been charged post-conviction with different offenses based on different conduct,[3] the Ninth Circuit requires the defendant to produce more evidence of vindictiveness than mere timing. *See Jenkins*, 504 F.3d at 701 (citing *United States v. Martinez*, 785 F.2d 663 (9th Cir. 1986), as supporting the proposition "that the mere filing of a second, unrelated charge after a first charge does not give rise to a presumption of vindictiveness"); *see also United States v. Robison*, 644 F.2d 1270, 1272–73 (9th Cir. 1981) ("The instant prosecution arose from events separate and distinct from those on which the earlier prosecutions were based. Although this fact is neither dispositive nor essential, to prove vindictiveness, it is one of the key indicia scrutinized by courts when confronted with a claim of vindictive prosecution. . . . The defendant's position is weakened by the fact that the instant prosecution is based on a different set of facts

---

[3] For this reason, the other case on which the defendant relies, *United States v. Rosenthal*, 2007 WL 801647, Crim. No. 02-53-CRB (N.D. Cal Mar. 14, 2007), is inapposite.  There, the defendant successfully appealed his conviction and the same prosecutor from the first trial subsequently superseded on the same conduct but with more charges.  *Id*. at *2.  The court found it was the "quintessential appearance of vindictiveness."  *Id*. at *3 ("The Government responded to the reversal by reindicting Rosenthal on essentially the same charges and adding four counts of tax evasion and one count of money laundering.  These circumstances—'upping the ante' as a result of Rosenthal's successful appeal—raise a presumption of vindictiveness.").  Here the relevant conduct and the two cases are unrelated.

from those previous prosecutions.").  In *Jenkins*, on which the defendant relies heavily, the Ninth Circuit found a reasonable or realistic likelihood of vindictiveness not because a second charge was filed after trial on other conduct, but because the government admittedly had enough to proceed on the new charges prior to the defendant exercising her right to testify in her own defense, including prior admissions by the defendant, and only sought the subsequent indictment after she made a further admission when testifying. 504 F.3d at 700-01.  The *Jenkins* court concluded that, by the government's own recognition, the defendant's testimony triggered the filing of the additional charges.  *Id*. at 701.  The defendant has proffered no similar evidence that the prosecutor's decision to seek an indictment here stemmed from some facet of the litigation of his prior case, nor can he.

The only remaining theory the defendant might be understood to be advancing is that the FBI agents in this case pursued the instant investigation in the first place in retaliation for some unspecified right he previously exercised.  Def.'s Mot. at 22.  But the motivation of the investigators is not the proper inquiry when evaluating why prosecutors sought charges.  It is only the bringing of additional charges chilling the exercise of rights with which the vindictive prosecution doctrine is concerned.  In any event, there is nothing to suggest the agents in this case had a vindictive motivation.  The defendant claims that the acceleration of investigative activity after the meeting with the environmental crimes agents provides evidence of vindictiveness, Def.'s Mot., ECF No. 62, at 22, but he fails to identify what about the contacts does so.  The investigation was already open by the time of the meeting, and the case agents in this case sought out Warden Kozicki and SA Baker as part of their standard approach to investigations—gather relevant evidence where it may exist.  Ex. A., Medearis Decl. ¶¶ 10, 12-13.  Moreover, the entirety of the agents' communications have been provided as exhibits and in SA Medearis's and Warden Koziciki's declarations.  The clear focus of their conversations were on evidence, not on the defendant's exercise of some right that might trigger retaliation.  *See id*. ¶¶ 13-17, Attachs. 5-8.  The investigation progressed as any investigation might—an analysis of available records followed by interviews about those records. The defendant offers nothing to suggest otherwise.[4]

---

[4] Indeed, the fast pace and timeframe of the investigation—April 2016 through August 2017—is explained more by the applicable statute of limitations than anything else.

1    "The doctrine of vindictive prosecution must not be misapplied by blurring the distinction between

2    what is actual retaliation and what is presumed.  The presumption applies only to the extent it reflects the

3    very real likelihood of actual vindictiveness." *Gallegos-Curiel*, 681 F.2d at 1167.  Here, the Government

4    received evidence that the defendant had made unlawful campaign contributions in an unrelated

5    investigation.  It then carried out its responsibility to investigate the other allegations of wrongdoing it had

6    received.  Ultimately, it gathered sufficient evidence to obtain an indictment and did so.  The defendant

7    has failed to meet his burden to show the Government acted for any other reasons and his motion to

8    dismiss should be denied.

9    **C.    The Defendant Has Not Met His Burden to Obtain Additional Discovery on His**
         **Vindictive Prosecution Claim.**

10

11    In addition to failing to meet his burden for dismissal on vindictive prosecution grounds, the

12    defendant has failed to demonstrate that he is entitled to additional discovery on the issue.  "In limited

13    circumstances, individuals have the right to pursue discovery against the government to support claims of

14    vindictive prosecution . . . if he or she establishes a prima facie showing of a likelihood of vindictiveness

15    by some evidence tending to show the essential elements of the defense." *United States v. One 1985*

16    *Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990); *see also United States v. Kuburovich*, No. 16-CR-373-EJD,

17    2018 WL 835049, at *2 (N.D. Cal. Feb. 13, 2018) (finding discovery appropriately ordered "if the

18    defendant provides some direct evidence of the Government's improper motivation, or some evidence that

19    the Government would not have indicted the case but for the exercise of a protected right.").

20    First, the defendant does not articulate with any particularity what the additional discovery he

21    believes will be helpful—this demonstrates that it is ultimately a fishing expedition on which the defendant

22    wants to embark.  Moreover, the defendant cites just two pieces of evidence that he claims provide "some

23    evidence" of vindictive prosecution to warrant discovery: (1) the contacts between the case agents on the

24    two cases in September and October 2016; and (2) his claim that the case agents violated U.S. Department

25    of Justice policy by opening an investigation into campaign finance violations without consulting the

26    Public Integrity Section.  Def.'s Mot., ECF No. 62, at 24.  As demonstrated in Attachment 3 to SA

27    Medearis's declaration, the second claim is incorrect—the FBI did consult with the Public Integrity

28

Section.  *See also* Ex. A, Medearis Decl. ¶ 10.

Further, as discussed above, there was nothing untoward about the contacts between the two investigative teams.  The defendant claims these contacts constituted "coordination" that somehow suggests vindictiveness, Def.'s Mot., ECF No. 62, at 24,[5] but identifies nothing about the contacts in which the agents coordinated anything.  Instead, the defendant appears to be making unwarranted characterizations in an attempt to make this case seem similar to the case he cites in which the Court did order discovery, *United States v. Fieger*, No. 07-CR-20414, 2008 WL 205244 (E.D. Mich. Jan. 24, 2008).  But an examination of *Fieger* reveals exactly why there is no evidence of vindictiveness in this case.  In *Fieger*, the court found many characteristics of the federal campaign finance investigation to give the appearance of vindictiveness, including that the AUSAs had not consulted with the Public Integrity Section prior to opening the case; the three top officials in the U.S. Attorney's Office had recused themselves seven months into the investigation; the government had executed a nighttime search warrant on the defendant's offices with 75 agents; the government had threatened the other donors tied to the defendant with prosecution; the government had inquired as to who the contributors had voted for; and, after the state prosecutor had declined charges involving state campaign finance offenses, the federal investigators had immediately executed a search warrant identical to a state subpoena to obtain all the state-seized records.  *Id.* at 5-6.  None of these factors are present here—and the extensiveness of them lays bare just how lacking the defendant's showing is here.  The defendant claims the meeting and contacts between the agents in this and the defendant's environmental case is the same as the coordination the court in *Fieger* found between the state and federal investigators after the state prosecutor declined the case in *Fieger*.  But beyond making this claim, the defendant provides no further explanation.  This cannot support further discovery.[6]

---

[5] Notably, the defendant claims it was coordination between "state and federal investigators . . . in fall 2016."  As the defendant acknowledges in other places, Warden Kozicki was cross-designated as a federal agent for purposes of the federal investigation.  It appears the defendant's new characterization is more the result of his efforts to fit this case into *Fieger* than anything else.

[6] If anything, the Government has already gone far beyond its discovery obligations in this case by providing the defendant with internal reports and information about the Government's decisionmaking as the investigation progressed to indictment, none of which is material to a case on the merits.  He identifies nothing more that could further his vindictive prosecution claim, or any of his other claims of

III.   THE DEFENDANT HAS FAILED TO MAKING A SHOWING OF SELECTIVE PROSECUTION AND HE IS NOT ENTITLED TO DISCOVERY ON HIS CLAIM.

The defendant claims he has been selected for prosecution because of his race. The Government sought an indictment charging the defendant with criminal violations of federal campaign finance laws because it had evidence demonstrating that the defendant had committed them and for no other reason. His motion to dismiss on selective prosecution grounds should be denied. In the alternative, the defendant asks for further discovery on his selective prosecution claim. The defendant does not make the requisite showing to be entitled to discovery, however, and that request too should be denied.

A.   The Defendant Has Failed to Present Clear Evidence that the Government Sought the Pending Indictment for Impermissible Reasons.

In recognition of the Executive Branch's broad discretion to enforce the criminal laws, a "presumption of regularity" attaches to prosecutorial decisionmaking. *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also Wayte v. United States*, 470 U.S. 598, 607 (1985) ("This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."). As the Court has recognized, "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. *Wayte*, 470 U.S. at 607. "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ). To overcome the presumption that a prosecutor has not violated equal protection, a defendant must present "clear evidence to the contrary," and show both discriminatory effect and discriminatory intent. *Id*. at 465. The Supreme Court has made clear that the standard for overcoming the presumption of regularity afforded the Executive Branch's prosecutorial decisionmaking "is a demanding one." *Id*. at 463. The defendant has failed to meet his demanding burden to here.

---

misconduct.

UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANT'S
MOTIONS TO DISMISS

First, the defendant has failed to show discriminatory effect.  To establish discriminatory effect, the defendant "must show that similarly situated individuals of a different race were not prosecuted." *Id.* at 465.  A "similarly situated" individual is one who is the same as the defendant "in all relevant respects" except for the factor identified as the potential basis for impermissible discrimination.  *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1060 (N.D. Cal. 2016) (citing *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989)).  Here, similarly situated individuals are those that could have been prosecuted for felony violations of the conduit contribution statute but were not.  *See Armstrong*, 517 at 465-67 (describing the similarly situated requirement by referencing cases in which the court considered whether the same ordinance was enforced solely against members of one race).

The defendant claims he has identified three similarly situated individuals of other races: "WW" and "JR," whose contributions to Candidate 1 and a supporting PAC are referenced in an FBI report in the unrelated investigation, Def.'s Mot., ECF No. 62, at 10-11; and Jeremy Johnson, an individual civilly prosecuted by the Federal Election Commission (FEC) for making conduit contributions in an amount greater than that which the defendant is alleged to have made here, *id*. at 11.  None of these individuals can properly be deemed similarly situated.

With respect to WW and JR, the defendant has failed to demonstrate that they made over $10,000 in conduit contributions to Candidate 1 in any calendar year and the Government does not have evidence that they did so.  Although the defendant asserts that JR and WW were "suspected illegal donor[s]" in the FBI's investigation leading to the pending Indictment, Def.'s Mot. at 7, the defendant's mere characterization does not control.  As an initial matter, the reports in which WW and JR are referenced and on which the defendant relies are from an unrelated investigation.  Ex. A, Medearis Decl. ¶¶ 2-5 & Attach. 1.  Moreover, although upon first review it appeared that contributions to a PAC supporting Candidate 1 may have exceeded federal limits, it was later confirmed that the particular PAC was an independent expenditure committee, Ex. P (FEC's website confirming that the PAC is a single-candidate independent expenditure committee), for which there are no limits.[7]    Even were there limits, merely

---

[7] https://www.fec.gov/help-candidates-and-committees/registering-pac/types-nonconnected-pacs/ (describing Super PACs).

exceeding contribution limits in one's own name by $2,500, as the defendant claims JR did, does not render a person similarly situated to an individual like the defendant who has used the names of multiple people to conceal thousands of dollars in unlawful conduit contributions exceeding $10,000 in two, consecutive calendar years.  The defendant also claims that WW is similarly situated to himself because, he asserts, WW "donated $13,500 to Candidate 1's campaign in 2012 through straw donations made by his family members" and "he made apparent conduit campaign contributions aggregating more than $25,200 to Candidate 1's campaign."  Def.'s Mot., ECF No. 62, at 11.  Tellingly, the defendant provides no evidence for his assertion that WW made conduit contributions in these amounts, nor does the Government possess such evidence.  *See* Ex. A, Medearis Decl. ¶ 7.

The defendant also identifies an individual, Jeremy Johnson, who he claims does not appear to be Asian, who was prosecuted civilly by the FEC for making conduit contributions.  Def.'s Mot., ECF No. 62, at 11.  First, the FEC is an agency different from the U.S. Department of Justice and only prosecutes civil violations of FECA.[8]  *See Mumphrey*, 193 F. Supp. 3d at 1066 (framing the relevant inquiry for a selective prosecution claim as "whether the prosecutors who made the charging decisions . . . engaged in race-based selectivity in deciding whether to prosecute").  Further, it does not appear Johnson could have been prosecuted in the Northern District of California.[9]  And in broadening his search for similarly situated individuals nationwide, the defendant ignores the many criminal indictments returned against individuals

---

[8] The Government notes that at the time the FEC filed its complaint, Johnson was under indictment in a separate criminal case for, among other offenses, conspiracy and bank fraud. *United States v. Johnson*, No. 11-CR-501 (D. Utah).  Based on public reporting, it also appears that the civil suit against Johnson arose in circumstances far different from those here.
*See*   https://www.deseretnews.com/article/865678580/Imprisoned-Jeremy-Johnson-refusing-to-respond-to-feds-in-FEC-case.html.

[9] Although not referenced in his motion, in addition to information about Jeremy Johnson, the defendant attaches in Exhibits K and L to his counsel's declaration, ECF No. 62-1, a conciliation agreement between the FEC and an individual and his corporations who self-reported making conduit contributions, news articles about a Boston law firm under grand jury investigation for making conduit contributions, and a news article about a complaint filed by third-party non-profit organizations with the FEC alleging an individual engaged in unlawful conduct in relation to his campaign (it is not clear from what the defendant attaches of what the specific allegations of conduit contributions consisted).  It is not clear on what basis the defendant claims that any of the individuals or corporations at the center of these materials are similarly situated to the defendant.

that appear to be of all different races for making campaign contributions in the names of others exceeding $10,000 a year. *See, e.g.*, *United States v. Adam Victor*, No. 17-CR-53, ECF Nos. 1, 4 (D.D.C.) (charged with making $17,500 in campaign contributions to federal candidates in the names of others in a calendar year); *United States v. Kenneth Smukler*, No. 17-CR-563, ECF No. 62 (E.D. Pa) (charged with making $23,750 in campaign contributions to a federal campaign in the name of another in a calendar year); *United States v. Michael Liberty*, No. 16-CR-144, ECF No. 2 (D. Maine) (charged with making $22,500 in contributions in the names of others in a calendar year). Accordingly, the defendant has failed to identify similarly situated individuals of other race who the prosecutors could have prosecuted but did not. The Court's inquiry can stop there.

Even if the defendant had made the requisite showing of discriminatory effect, he has failed to show discriminatory intent on the part of the prosecutors in this case—a necessary showing for dismissal. "The kind of intent to be proved is that the government undertook a particular course of action 'at least in part because of, not merely in spite of its adverse effects upon an identifiable group.'" *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (quoting *Wayte*, 470 U.S. at 610) (internal quotation marks omitted). The defendant concedes he has no direct evidence of discriminatory intent on the part of the prosecutors in this matter, Def.'s Mot., ECF No. 62, at 12 ("Mr. Tong cannot point to any direct evidence of a discriminatory purpose on the part of the prosecutors.")—nor could he, because the prosecutorial decisionmaking in this case had nothing to do with his race.

Instead, the defendant claims that the prosecutors' discriminatory intent "can be inferred from the 'totality of the relevant facts.'" Def.'s Mot, ECF No. 62, at 12. The "facts" the defendant points to are (1) his claims about JR, WW, and Jeremy Johnson as similarly situated individuals, and (2) the contacts between the case agents from the defendant's two criminal cases in September and October 2016. *Id.* As JR, WW, and Johnson are not similarly situated. Johnson was not even subject to prosecution in this district. Prosecutorial decisionmaking with respect to him can provide no indication about the intent of the prosecutors in this case. In any event, a showing of discriminatory effect does not support a discriminatory intent showing. *See Turner*, 104 F.3d at 1184. The defendant's claim about the contacts between the case agents is equally meritless. The defendant asserts discriminatory intent because the case

1  agents from his prior case "inserted" themselves into this case.  The defendant offers no reason other than

2  his equally meritless claim that the Government violated his plea agreement to make this argument.  And

3  he provides no explanation for how, even if his plea violation argument were correct, the contacts would

4  impute discriminatory intent to the prosecutors.  The defendant cannot simply point to facets of the

5  investigation he does not like, attempt to color them with a nefarious purpose by labeling the case agents

6  with words like "complicit," Def.'s Mot., ECF No. 62, at 12, and claim he has shown discriminatory intent

7  on the part of the prosecutors.  The defendant has failed to meet his burden.

8      Finally, the defendant claims investigators improperly targeted straw donors for interviews and as

9  the subjects of grand jury subpoenas issued for financial records.  Def.'s Mot. at 12-13.  The defendant

10  does not dispute that most of the interviewed witnesses had relevant evidence for the investigation, and,

11  in any event, it is unclear how the witnesses interviewed relates to a selective prosecution claim.

12  Nevertheless, the defendant once again points to straightforward investigation steps, Ex. A, Medearis

13  Decl. ¶ 11, slaps an untoward label on it, and then claims to have proven something with respect to the

14  prosecutors' intent.  The Government did not choose the witnesses that needed to be interviewed or that

15  fell within the scope of the investigation—the defendant did so when he selected the individuals he used

16  to make unlawful conduit contributions.[10]  Of course, through the investigative process, the Government

17  found some individuals who were not, in fact, reimbursed by the defendant—but, despite the defendant's

18  suggestion otherwise, this proves nothing but that the Government was seeking the truth, whatever it may

19  be.  Even to the extent the individuals the Government interviewed in the course of an investigation could

20  be considered in deciding a selective prosecution motion, the defendant offers no evidence of improper

21  targeting here.

22

23

24      [10]  The three individuals the defendant points to as evidence of the Government's improper
   "targeting" demonstrate the normal progression of the Government's investigation.  The first two
25  contributed around the time of confirmed conduit contributors and in amounts similar to other confirmed
   conduit contributors.  Exs. Q, R.  The third attended a defendant-hosted fundraiser and contributed at the
26  request of an individual who the Government had reason to believe had been solicited and reimbursed by
   the defendant.  Ex. S.  And, in fact, it was later confirmed that the inviting individual had in fact been
27  reimbursed by the defendant.  *See* Ex. E at 15:16-17:11 (citing a list of conduit donors that includes the
   individual who invited the third donor the defendant identifies).

28

**B.  The Defendant Has Not Met His Burden to Obtain Discovery on His Selective Prosecution Claim.**

In the alternative, the defendant requests discovery on his selective prosecution claim, but this request too should be denied.  As the Supreme Court has recognized, due to the concerns of imposing on the province of the Executive, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."  *Armstrong*, 517 U.S. at 463-464; *see also United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) (noting the "rigorous standard" required by the Supreme Court for discovery on a claim of selective prosecution).  Accordingly, a defendant seeking discovery related to a selective prosecution claim "must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002).  As described above the defendant has shown no evidence on either front here.  His attempt to open a fishing expedition into the Government's files should be denied.

## IV.    THE DEFENDANT HAS FAILED TO MAKE A SHOWING OF SELECTIVE ENCOREMENT AND ADDITIONAL DISCOVERY[11] IS NOT WARRANTED.

The defendant claims that, in addition to selective prosecution, the pending Indictment is also the result of selective enforcement.  As he did in making his selective prosecution claim, the defendant attempts to support his selective enforcement claim with mischaracterizations of the evidence collected by the FBI and broad claims of discriminatory motive with no actual evidence to support them.  He has failed to meet his burden for dismissal of the Indictment on selective enforcement grounds.  Moreover, he renews his motion for discovery on his selective enforcement claim.  As the Court did before, it should deny this request again.

**A.    The Defendant Has Failed to Present Evidence that the Pending Indictment is the Result of Selective Enforcement.**

The showing for a selective enforcement claim is similar to that for a selective prosecution claim.

---

[11] Although the relevant section of the defendant's motion is titled as a request for an evidentiary hearing, the substance of his argument raises only a request for discovery.  Def.'s Mot., ECF No. 62, at 16.  Because the defendant has made no argument for an evidentiary hearing, the Government responds only to his request for additional discovery.

UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANT'S
MOTIONS TO DISMISS
17-CR-474-JST                                    21

1   The defendant bears the burden to demonstrate "that enforcement had a discriminatory effect and the

2   police were motivated by a discriminatory purpose." *Rosenbaum v. City and County of San Francisco*,

3   484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte*, 470 U.S. at 608) (reviewing a claim of discriminatory

4   enforcement of a municipal noise ordinance).  As in a selective prosecution claim, a defendant establishes

5   discriminatory effect by showing similarly situated individuals were not prosecuted and establishes

6   discriminatory purpose by showing that "the decision-maker . . . selected or reaffirmed a particular course

7   of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

8   group." *Id.* at 1153 (quoting *Wayte*, 470 U.S. at 610) (internal quotation marks omitted).

9       The defendant relies on the same evidence to support his selective enforcement claim as he did his

10   selective prosecution claim.  First, he claims that investigators focused only on him despite two others—

11   JR and WW—being "on their radars because of the same behavior."  Def.'s Mot., ECF No. 62, at 16.  As

12   described above, the initiation of an investigation into the defendant for conduit contributions was

13   triggered by witnesses' statements in May 2015 during an unrelated investigation.  Ex. A, Medearis Decl.

14   ¶¶ 8, 10.  The FBI simply followed the evidence it received, and it never received similar information

15   about JR and WW. *Id.* ¶¶ 4-8.  The defendant also claims that "the fact that Mr. Tong and all of the alleged

16   conduit donors were Chinese strongly suggests discriminatory impact."  Def.'s Mot., ECF No. 62, at 16.

17   As an initial matter, the Government does not believe all the defendant's conduit contributors to be

18   Chinese, and it is unclear how the defendant reached that conclusion.  Moreover, the relevant inquiry for

19   discriminatory effect is whether similarly situated individuals were not prosecuted.  The class of straw

20   donors the defendant chose to use for his scheme tells nothing about others subject to prosecution.

21       Moreover, as with his selective prosecution claim, the only evidence of discriminatory motive the

22   defendant can muster is the contacts between the case agents on his two criminal cases that he continues

23   to erroneous claim was improper.  This time, the defendant claims discriminatory motive of the FBI agents

24   on this case can properly be inferred from "Baker's choice to lend a hand" and "Kozicki's choice to meet

25   with Medearis."  Def.'s Mot., ECF No. 62, at 16.  Again, the Government fails to see how sharing

26   information between agents who have investigated the same individual for conduct occurring during the

27   same time period evidences a discriminatory motive.  It would be a strange outcome if investigative

28

1   agencies did not communicate where commonality may exist.  Further, SA Baker and Warden Kozicki

2   were not assigned to the instant investigation.  Even if the defendant was able to provide some explanation

3   as to why the environmental crimes case agents' "choice" to meet the FBI agents assigned to the pending

4   case reflected a discriminatory motive, their "choices" tell the Court nothing of the motives of the case

5   agents that actually investigated the instant case.  The defendant has failed to meet his burden to show

6   discriminatory enforcement.

7       **B.      The Defendant is Not Entitled to Discovery on His Selective Enforcement Claim.**

8           In the alternative, the defendant renews his request for discovery on his selective enforcement

9   claim.  The Court has already denied this request once, Order, ECF No. 51, and the defendant offers

10  nothing new that would warrant changing the Court's prior ruling.  First, as he did before, the defendant

11  relies on the Ninth Circuit's opinion in *Sellers*, to argue that the standard for ordering discovery for a

12  selective enforcement claim is lower than that for a selective prosecution claim and that, accordingly, he

13  need not provide evidence of similarly situated individuals of different races who were not investigated.

14  Def.'s Mot., ECF No. 62, at 17-18.  As the Government has previously pointed out, the Ninth Circuit

15  explicitly limited its ruling in *Sellers* to the stash house reverse-sting context.[12]  906 F.3d at 855.  The

16  Ninth Circuit in *Sellers* was very clear that its ruling in that case was the result of special concerns raised

17  by the operations at issue.  906 F.3d at 853-54.  The same concerns do not exist here.

18          Regardless of the standard this Court adopts, however, the defendant fails to make the required

19  showing under any.  First, he offers not even some evidence of discriminatory intent on the part of law

20  enforcement.  The defendant attempts to compare this case to *United States v. Mumphrey*, claiming that,

21  just as the court found it probative of discriminatory intent that 100% of the arrested individuals were of

22

23          [12] Indeed, in advancing his argument, the defendant at least twice quotes the first half of sentences
24  from *Sellers*, and omits the second half in which the Court affirms the limitation to stash house reverse-
    sting operations.  *Compare, e.g.*, Def.'s Mot., ECF No. 62, at 17 ("The court said that '[w]hile a defendant
25  must have *something* more than mere speculation to be entitled to discovery,' he 'need not proffer
    evidence that similarly-situated individuals of a different race were not investigated or arrested to receive
26  discovery...'" (quoting *Sellers*, 906 F.3d at 855)) *with Sellers*, 906 F.3d at 855 ("A defendant need not
    proffer evidence that similarly-situated individuals of a different race were not investigated or arrested to
27  receive discovery on his selective enforcement claim *in a stash house reverse-sting operation case.*"
    (emphasis added)).

28

the same race in *Mumphrey*, 100% of the individuals charged here—just the defendant—are of the same race. *See* Def.'s Mot., ECF No. 62, at 18 (citing *Mumphrey*, 193 F. Supp. 3d at 1063). But the operative finding for discriminatory intent in *Mumphrey* was not simply the race of the defendants in a vacuum, it was the fact that there was a large statistical disparity between the percentage of African Americans arrested—100%—and their representation in the "relevant population," along with additional evidence that San Francisco police officers were aware of offenders of other races but did not pursue them and that some had made race-based comments. 193 F. Supp. 3d at 1063-64. The defendant makes no similar showing here. Indeed, he does not even identify a "relevant population" that would suggest a significant statistical disparity.

Nor does the defendant identify any similarly situated individuals the law enforcement agents here did not investigation. As already discussed, the defendant's identification of JR and WW as similarly situated is based on his incorrect understanding of the facts. And, as discussed above, there is a plethora of individuals, who appear to be of many different races, who have tried to unlawfully funnel money to federal candidates for office and who have been investigated and prosecuted. The defendant still fails to meet his burden to warrant discovery.

## V.    THE STATUTE BARRING CONTRIBUTIONS IN THE NAMES OF OTHERS IS NOT UNCONSTITUTIONALLY VAGUE.

The defendant claims that the penalty provision of FECA, 52 U.S.C. § 30109(d), is unconstitutionally vague. According to the defendant, because individuals can be prosecuted for conduit contributions aggregating between $10,000 and $25,000 under either the misdemeanor or felony provision, potential violators cannot determine possible punishment. Def.'s Mot., ECF No. 59, at 7-10. Where Congress simply provides for different penalties for the same conduct, it is well-settled that prosecutors have discretion to choose a charge without violating the defendant's due process rights. *See United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements

of the Due Process Clause are satisfied."); *United States v. Edmonson*, 792 F.2d 1492, 1497 (9th Cir. 1986) ("[T]he discretion to prosecute carries with it the discretion to choose the statute that will be charged. The district court has no power to deny the United States Attorney his prerogative under the Separation of Powers doctrine. When, as here, conduct violates more than one criminal statute the government may generally elect which statute it wishes to charge. This is so even though one statute imposes felony penalties and the other merely imposes misdemeanor penalties.").

The defendant does not claim that he cannot tell what conduct is unlawful under FECA—in fact, he confirmed in his voluntary interview with FBI agents that he understood what conduit contributions were and that they were unlawful, Ex. J. Nor does he claim that the thresholds for misdemeanor and felony violations—$2,000 and $10,000, respectively—are indiscernible. *See* Def.'s Mot., ECF No. 59, at 5 (acknowledging that "one [provision] calls for a one-year prison term for amounts between $2,000 and $25,000, while the other calls for a two-year prison term for amounts between $10,000 and $25,000). *Cf. Johnson v. United States*, 135 S.Ct. 2551, 2556-57 (2015) (invalidating the residual clause of the Armed Career Criminal Act because of the inability to clearly define *the conduct* that determines the applicability of a fifteen-year mandatory minimum sentence (emphasis added)). Nor could he reasonably make that claim—the statutory language is clear in defining what is proscribed. Instead, his vagueness argument amounts to a complaint that, with respect to conduit contributions aggregating between $10,000 and $25,000 in a calendar year, the prosecutor has the choice of which provision to charge—a felony at the $10,000 threshold, 52 U.S.C. § 30109(d)(1)(D)(i), or a misdemeanor at the $2,000 threshold, 52 U.S.C. § 30109(d)(1)(A)(ii). The Government in this case charged the defendant under the two-year felony provision. Indictment ¶¶ 9, 11. That it could have charged him with the lesser-included misdemeanor offense does not render FECA vague.[13] His motion to dismiss on vagueness grounds must be denied.

---

[13] Nor does the rule of lenity require this Court to override the Government's discretion in making charging decisions as the defendant claims. Def.'s Mot., ECF No. 59, at 10-11. "[T]he rule of lenity applies only when the statutory language contains grievous ambiguity or uncertainty and when, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008) (internal quotation marks and citation omitted). Choices exist for prosecutors throughout the criminal code. A mere choice among clearly defined potential punishments does not create ambiguity. *See Batcheldor*, 442 U.S. at 123..

## VI.    CONCLUSION

The defendant has been charged with engaging in what is unfortunately a common scheme—funnel thousands of dollars to a favored candidate for office and hide its true source.  Our democracy is built on citizens' financial support of candidates for public office, but it is also built on providing transparency as to those supporters' identities.  The defendant undermined the public's right to such transparency when he made contributions in the names of others and was investigated and charged because of it.  There is nothing improper about the pending Indictment against the defendant.  His motions to dismiss making claims that it is otherwise are meritless and should be denied.  His motions for continued discovery should be denied as well.  The defendant has had over 18 months to develop his claims.  More time to rummage through the Government's files on baseless claims of misconduct is unwarranted.

DATED:  April 16, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section
U.S. Department of Justice

_____/s/_____
S. WAQAR HASIB
Assistant United States Attorney

AMANDA VAUGHN
Trial Attorney